UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| HANNAH HEIGHTS OWNERS ASSOCIATION, INC. (WASHINGTON), <br><br> Plaintiff, <br><br> *v.* <br><br> 3M COMPANY, <br> TYCO FIRE PRODUCTS LP, <br> BASF CORPORATION, <br> SAN JUAN COUNTY FIRE PROTECTION DISTRICT NO. 3 (WASHINGTON) <br><br> Defendants. | Case No. _____ <br><br> COMPLAINT <br> AND JURY DEMAND |

COMPLAINT AND JURY DEMAND - 1

**TABLE OF CONTENTS**

I.      SUMMARY OF CLAIM ........................................................................4

II.     JURISDICTION AND VENUE .........................................................10

III.    PLAINTIFF........................................................................................10

IV.     DEFENDANTS .................................................................................11

V.      FACTUAL ALLEGATIONS .............................................................12

        A.      PFAS poses a threat to human health and the environment.....................12

        B.      Since the 1950s, PFAS-containing products made and sold by
                Manufacturer Defendants have contaminated the environment. ...............16

        C.      Since the 1960s, AFFF has been used and released into the
                environment. ........................................................................17

        D.      Manufacturer Defendants supplied AFFF to the Fire District. .................18

        E.      Manufacturing Defendants knew and failed to provide notice that
                PFAS and PFAS-containing products are toxic.........................................20

        F.      The Fire District used and released AFFF at the Fire House....................30

        G.      Hannah Heights has been damaged by Defendants' actions, and that
                damage is ongoing. ........................................................................31

VI.     FIRST CLAIM FOR RELIEF – MTCA AND DECLARATORY
        JUDGMENT (MANUFACTUING DEFENDANTS AND DEFENDANT
        FIRE DISTRICT)........................................................................34

VII.    SECOND CLAIM FOR RELIEF – COMPREHENSIVE
        ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY
        ACT (MANUFACTUING DEFENDANTS AND DEFENDANT FIRE
        DISTRICT) ........................................................................36

VIII.   THIRD CLAIM FOR RELIEF – NEGLIGENCE (MANUFCTURING
        DEFENDANTS AND DEFENDANT FIRE DISTRICT)....................................41

IX.     FOURTH CLAIM FOR RELIEF – DEFECTIVE PRODUCT – FAILURE TO
        WARN (MANUFACTURING DEFENDANTS) .................................................44

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

X.     FIFTH CLAIM FOR RELIEF – DEFECTIVE PRODUCT – DESIGN
       DEFECT (MANUFACTURING DEFENDANTS) ...............................................48

XI.    SIXTH CLAIM FOR RELIEF – NUISANCE (MANUFACTURING
       DEFENDANTS AND DEFENDANT FIRE DISTRICT)....................................51

XII.   SEVENTH CLAIM FOR RELIEF – TRESPASS (DEFENDANT FIRE
       DISTRICT) .........................................................................................................54

XIII.  EIGHTH CLAIM FOR RELIEF – UNJUST ENRICHMENT
       (MANUFACTURING DEFENDANTS)................................................................56

XIV.   NINTH CLAIM FOR RELIEF – DECLARATORY JUDGMENT
       (MANUFACTURING DEFENDANTS AND DEFENDANT FIRE
       DISTRICT) .........................................................................................................57

XV.    TENTH CLAIM FOR RELIEF – WASHINGTON CONSUMER
       PROTECTION ACT (MANUFACTURING DEFENDANTS)...........................59

XVI.   PRAYER FOR RELIEF ....................................................................................60

XVII.  DEMAND FOR JURY TRIAL ..........................................................................61

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

Hannah Heights Owners Association, Inc. ("Hannah Heights"), by and through its attorneys, hereby alleges as follows:

## I.    SUMMARY OF CLAIM

1.    Hannah Heights, a community of roughly four dozen households, sits on the western edge of San Juan Island in Puget Sound. The community is located on a relatively remote, rocky island in Washington with scarce access to fresh water and limited options to connect to or create new water sources.

2.    In May 2023, Hannah Heights' drinking water contamination made headlines in news and media outlets for having the highest levels of per- and polyfluoroalkyl substances ("PFAS") in a Washington public water system.

3.    Well 2, which has provided roughly 70-80% of water consumed in the community, produced sampling results in May 2023 that detected perfluorooctane sulfonate ("PFOS") at 9400 parts per trillion ("ppt"), two thousand three-hundred and fifty times EPA's 4 ppt Maximum Contaminant Level ("MCL") for drinking water; perfluorohexane sulfonic acid ("PFHxS") at 7550 ppt, seven hundred and fifty-five times the 10 ppt MCL; and perfluorooctanoic acid ("PFOA") at 373 ppt, over ninety-three times the 4 ppt MCL.

4.    Hannah Heights has two wells that supply drinking water to the community. Well 2 is located at Station 33, the Bailer Hill/Little Mountain Fire House ("Fire House"). The Fire House and Well 2 are located on land owned by Hannah Heights and leased by the San Juan County Fire Protection District No. 3 ("Fire District"). Well 2 provides more than 10 gallons per minute all year. Well 3 produces four gallons per minute or less in winter and is dry in summer months. Well 1 went dry 30 years ago.

COMPLAINT AND JURY DEMAND - 4

5.     Shortly after discovering PFAS in Well 2, its principal and only well capable of meeting the community's water system demands, and urging by San Juan County, Hannah Heights declared a state of emergency. As a result of PFAS contamination, Hannah Heights remains under a "Do Not Drink" water advisory from the Washington State Department of Health that has been in place for almost 2 years. The advisory states that customers on the west side of San Juan Island, southwest of Friday Harbor, should use only purchased bottled water for drinking and cooking until further notice. The water advisory is what first necessitated that the community begin trucking in water to ensure an adequate supply.

6.     Since discovering PFAS in its water system, Hannah Heights has been actively seeking alternative water sources and treatment systems. Despite its best efforts, Hannah Heights has yet to find a sufficient alternate water source to its contaminated Well 2.

7.     Hannah Heights has had water trucked into the neighborhood and relied more heavily on its Well 3 to supplement drinking water supplies while the contaminated Well 2 is offline. Hannah Heights has also pursued well easements to drill outside the neighborhood where potential water sources exist, but these efforts have not succeeded due to limited water supplies on the island. As there are few other areas within the Hannah Heights neighborhood where a well could provide an adequate water supply, Hannah Heights has also been seeking treatment options for Well 2, or any other new well they may need to drill in the contaminated area before the area is fully remediated. Implementing a necessary treatment system to adequately remediate Hannah Heights' contamination may require either a full-scale recommission of Well 2 or application to a newly drilled well in the same vicinity as Well 2.

COMPLAINT AND JURY DEMAND - 5

8.     Since PFAS was first detected in Hannah Heights' water system, the community has faced growing concerns about how residents will receive water for drinking, cooking, bathing, washing, gardening, and other uses.

9.     Hannah Heights is run by a seven-person volunteer board. Due to its size, Hannah Heights lacks the resources and infrastructure that are typically available to larger municipalities to respond to such an issue.

10.     Hannah Heights brings this action for injunctive, monetary, and declaratory relief to address the presence of PFAS—including, but not limited to, PFOS, PFOA, and PFHxS—in Hannah Heights' drinking water sources, real property, water rights, and related property ("Hannah Heights Property").

11.     PFAS are a group of toxic, extremely persistent, and bioaccumulative synthetic chemicals. When consumed, PFAS can cause serious health impacts.

12.     The 3M Company ("3M"), Tyco Fire Products LP ("Tyco"), and BASF Corporation ("BASF") (together, the "Manufacturer Defendants"), and the Fire District (collectively, "Defendants") are responsible for PFAS released into the water sources that supply Hannah Heights' public water supply system and other property owned by, and impacting, Hannah Heights.

13.     For years, Manufacturer Defendants manufactured, sold, and/or distributed compounds and products containing PFAS. These products include the firefighting suppressant agent "aqueous film-forming foam" ("AFFF"), which contains PFAS and is used at fire-fighting training facilities.[1]

---

[1] Unless otherwise noted, all mentions of "AFFF" refer to AFFF containing PFAS, and includes PFAS component parts of AFFF, including, but not necessarily limited to, PFOA, PFOS, PFNA, PFBS, and HFPO-DA.

COMPLAINT AND JURY DEMAND - 6

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

14.     Manufacturer Defendants knew that PFAS and related constituents present unreasonable risks to human health, water quality, and the environment. Yet they manufactured, distributed, and sold these chemicals with inadequate warning of their toxic effects. They did so without regard to the health of Hannah Heights' drinking water customers or Hannah Heights' property interests, both of which could foreseeably be damaged once these chemicals infiltrated the environment.

15.     Manufacturer Defendants marketed and/or distributed and sold their AFFF and other PFAS-containing products with knowledge that they would be used in training exercises, fire control, fire suppression systems, emergency situations, and other ways at fire-fighting facilities.

16.     Manufacturer Defendants knew such use would release PFAS and other contaminants into the environment.

17.     Manufacturer Defendants' acts and omissions contaminated Hannah Heights Property with PFAS. This contamination has been found in Hannah Heights' water sources from which Hannah Heights draws water to supply its residents.

18.     Manufacturer Defendants' negligent development, manufacturing, distribution, marketing, and/or sale of AFFF and other PFAS-containing products contaminated Hannah Heights' Property with PFAS.

19.     Through their development, manufacturing, distribution, marketing, and/or sale of AFFF; violations of the Model Toxics Control Act ("MTCA"), Chapter 70A.305 RCW; the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601; the Washington Consumer Protect Act ("CPA"), Chapter 19.86 RCW; and

COMPLAINT AND JURY DEMAND - 7

through their nuisance and negligence, Manufacturer Defendants proximately caused Hannah Heights' injuries and damages by contaminating Hannah Heights Property.

20.     Likewise, Defendant Fire District's uncontrolled release of PFAS, which are hazardous substances, onto Hannah Heights Property, including at the Fire House located at 3189 Bailer Hill Road, Friday Harbor, Washington 98250, caused Hannah Heights to incur and continue to incur costs. From at least 1992 until 2018, the Fire District released PFAS to groundwater through its use and handling of AFFF during training events and other activities at the Fire House on Hannah Heights property.

21.     Well 2 is immediately adjacent to, and downhill from the Fire House. Volunteer firefighters recall foam drills occurring at the Fire House once or twice a year in the 1990s and 2000s. Training logs document the firefighters' practice applying Class B foam, an AFFF. A log from 2006 instructs that, "firefighters should demonstrate the application of foam on a mock fuel spill. Each crew should demonstrate (as possible) the three techniques used in foam application." Training included, "set[ting] up a simulated fuel spill and/or fire" and firefighters would "respond to the location" by "trad[ing] off applying AFFF properly". Drill reports specifically mention "foam practice" and "foam operations". Firefighters practiced by aiming foam at the bushes and trees within which Well 2 is located. After the drills, the firefighters cleaned their hoses by running water through them at the Fire House. The training logs describing these practices date back until at least 1992. Logs specifically reference Station 33, the identification used for the Fire House.

22.     The Fire District's improper handling and release of PFAS has contaminated, and continues to contaminate, Hannah Heights Property. Specifically, due to its CERCLA and

COMPLAINT AND JURY DEMAND - 8

MTCA violations, trespass, nuisance, and negligence, the Fire District, acting through its employees and personnel, caused Hannah Heights' injuries and damages by contaminating Hannah Heights Property.

23.     This action thus arises from the negligent, intentional, wrongful, and illegal acts and omissions by Manufacturer Defendants and the Fire District that contaminated Hannah Heights Property.

24.     As a result of Defendants' contamination of Hannah Heights Property, Hannah Heights has and will continue to incur significant expenses and losses associated with its inability to use its water supply, continued water quality testing, assessing and implementing filtration systems, removing wells from and keeping wells out of service, identifying and obtaining alternate water supplies, and otherwise responding to and mitigating the impacts of PFAS contamination on Hannah Heights Property.

25.     Under common law, Hannah Heights seeks injunctive relief requiring that Defendants, as necessary: fund installation of filtration systems or other best remediation technology as determined by Hannah Heights, and other infrastructure necessary to remediate PFAS in Hannah Heights' affected wells and associated systems; build new wells that draw water from areas unaffected by PFAS; remediate the soil underlying the Fire House and surrounding Hannah Heights property, which has been used by the Fire District for over 30 years to conduct firefighting training, as necessary to prevent that potential major source of PFAS from further entering Hannah Heights' water supply; and supply Hannah Heights' residents with a new or alternative water supplies unaffected by PFAS as necessary to meet demand.

26.     Under federal and state law set forth further below, Hannah Heights also seeks

COMPLAINT AND JURY DEMAND - 9

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA 98101
Phone (206) 292-2600
Fax (206) 292-2601

from Defendants compensatory, consequential and incidental damages; restitution; declaratory judgment; and any additional appropriate relief.

## II.     JURISDICTION AND VENUE

27.     This Court has federal question jurisdiction under 28 U.S.C. § 1332 to hear the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") claims against Defendants set forth in this Complaint under Section 107 of CERCLA, 42 U.S.C. § 9607(a).

28.     This Court has jurisdiction to hear Hannah Heights' claims against Manufacturer Defendants pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000.

29.     This Court also has supplemental jurisdiction over Hannah Heights' state law claims against Defendants under 28 U.S.C. § 1367.

30.     In addition, the Declaratory Judgments Act, 28 U.S.C. § 2201, authorizes this Court to grant declaratory relief in this matter.

31.     Venue is appropriate in the Western District of Washington pursuant to 28 U.S.C. § 1391, because it is the District in which Hannah Heights resides and maintains its principal place of business, in which a substantial part of the property that is the subject of this action is situated, and in which a substantial part of the events and omissions giving rise to this complaint occurred.

## III.     PLAINTIFF

32.     Plaintiff Hannah Heights is a Washington non-profit corporation with its principal place of business at P.O. Box 722, Friday Harbor, WA 98250.

COMPLAINT AND JURY DEMAND - 10

33.     Hannah Heights is a municipal water purveyor with municipal water rights issued by the Washington State Department of Ecology ("Ecology"). Hannah Heights operates a public water system that supplies drinking water to approximately 43 homes in the Hannah Heights community through an interconnected water supply and distribution system. Hannah Heights' water system is maintained and regulated by the Washington State Department of Health.

34.     Well 2, located on Hannah Heights' property containing the Fire House, has historically provided roughly 70-80% of water consumed in the community.

## IV.     DEFENDANTS

35.     Defendant 3M is a Delaware corporation with its principal place of business is at 3M Center, St. Paul, Minnesota 55144-1000.[2]

36.     Defendant Tyco is a Delaware limited partnership with its principal place of business at 1467 Elmwood Ave., Cranston, Rhode Island 02910. On information and belief, Tyco is the successor-in-interest to Ansul, Inc. ("Ansul"). On information and belief, Tyco's governing partners are citizens of Florida, Pennsylvania, and Delaware. Tyco acquired Chemguard in 2011.

37.     Defendant BASF is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. BASF previously acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.

38.     Defendant Fire District is a special purpose district and municipal corporation with its principal place of business at 1011 Mullis Street, Friday Harbor, WA 98250.

---

[2] Hannah Heights successfully opted out of the 3M Settlement Agreement (Dkt. 3793-2), the Tyco Settlement Agreement (Dkt. 5053-3), and the BASF Settlement Agreement (Dkt. 4911-3), and therefore did not release any claims against 3M, Tyco, or BASF.

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

## V.     FACTUAL ALLEGATIONS

**A. PFAS poses a threat to human health and the environment.**

39.     PFAS are a family of synthetic chemicals containing fluorine and carbon atoms. As used in this Complaint, the term "PFAS" includes all PFAS that have been or may be detected in Hannah Heights Property, including, inter alia, PFOA, PFOS, perfluorononanoic acid ("PFNA"), PFHxS, and perfluorobutanesulfonic acid ("PFBS").

40.     PFAS have strong surfactant properties, meaning they reduce the surface tension between a liquid and another liquid or solid. For this reason, they are effective in products requiring fire resistance or oil, stain, grease, and water repellency.

41.     PFAS are in many products, including, but not limited to: firefighting foams, wire insulation, cleaners, textiles, leather, paper, and paints.

42.     PFAS are not naturally occurring. Thus, PFAS detected in the environment and in humans are attributable to human activity.

43.     Hundreds of PFAS have been manufactured, distributed, and sold in the United States.

44.     The two most widely known and studied PFAS are PFOA and PFOS.

45.     Due to their chemical structure, PFAS do not normally hydrolyze, photolyze, or biodegrade under environmental conditions, and are extremely persistent in the environment and in human tissue.

46.     PFAS also are particularly mobile in soil and water, readily absorbed into groundwater, and can migrate across long distances.

47.     Studies have shown that PFAS bioaccumulate and biomagnify in humans and

COMPLAINT AND JURY DEMAND - 12

2:25-cv-03486-RMG     Date Filed 04/10/25     Entry Number 1     Page 13 of 62

wildlife.

48.     Specifically, humans may absorb PFAS from drinking water. PFAS accumulate primarily in the blood stream, kidneys, and liver.

49.     In 2009, the U.S. Environmental Protection Agency ("EPA") issued Provisional Health Advisories "to assess potential risk from exposure to [PFOS and PFOA] through drinking water," setting provisional lifetime health advisory levels of 400 ppt for PFOA and 200 ppt for PFOS. No sampling was required until 2012.

50.     In May 2016, EPA issued lower health advisories for PFOA and PFOS warning that drinking water containing PFAS above a combined value of 70 ppt for PFOA and PFOS poses risks of adverse human health effects. EPA announced the Health Advisories on May 19, 2016, and published them in the Federal Register on May 25, 2016.

51.     According to EPA, health risks associated with PFAS include "developmental effects to fetuses during pregnancy or to breast-fed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), and other effects (e.g., cholesterol changes)."

52.     In June 2022, EPA established lower drinking water interim health advisory limits ("Health Advisories") for PFOA and PFOS at .004 and .02 ppt, respectively. At the same time, EPA created two additional Health Advisories for GenX and PFBS at 10 and 2,000 ppt respectively.[3] EPA set the Interim HALs at levels below which PFOS and PFOA can be measured using current analytic methods, meaning that the mere detection of PFOS or PFOA in

---

[3] *See* Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36848 (June 21, 2022).

COMPLAINT AND JURY DEMAND - 13

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

a water provider's system results in an exceedance of the new levels.

53.    In January 2024, EPA proposed to list nine PFAS, including PFOA and PFOS, as hazardous constituents under RCRA, 42 U.S.C. § 6901 et seq., enabling EPA to require investigation and cleanup of these PFAS at facilities that treat, store, or dispose of hazardous wastes. EPA also proposed to expand the agency's authority in a way that would allow it to address thousands of other PFAS that have not formally been found to be hazardous.

54.    In April 2024, EPA finalized MCLs under the federal Safe Drinking Water Act ("SDWA") for PFOA and PFOS of 4 ppt each and for PFHxS, PFNA, and HFPO-DA ("GenX") at 10 ppt each; it is also regulating mixtures of PFNA, PFHxS, PFBS, and/or GenX under a unitless threshold called a "Hazard Index," based on the combined concentrations of those four PFAS.

55.    In April 2024, EPA designated PFOA and PFOS as hazardous substances under CERCLA. EPA is also considering whether to designate several other PFAS and/or entire categories of PFAS as hazardous substances under CERCLA.

56.    These EPA actions are predicated in part on studies completed on PFAS by the Agency for Toxic Substances and Disease Registry ("ATSDR"), the U.S. Public Health Service, and the U.S. Department of Health and Human Services, which show that PFAS, including PFOA and PFOS, may adversely affect human health and the environment.

57.    For example: on June 20, 2018, the ATSDR and the U.S. Department of Health and Human Services released a draft toxicological profile for perfluoroalkyls for public comment ("2018 ATSDR Toxics Profile").

58.    The 2018 ATSDR Toxics Profile was prepared pursuant to CERCLA § 104(i), 42

COMPLAINT AND JURY DEMAND - 14

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA 98101
Phone (206) 292-2600
Fax (206) 292-2601

U.S.C. § 9604(i), and characterizes the toxicological and adverse health effects for 14 PFAS. In it, ATSDR set provisional minimal risk levels for the PFAS analyzed. It concluded that several have long half-lives in humans, and that PFAS exposure can cause several adverse health outcomes.

59.    The 2018 ATSDR Toxics Profile explains that "EPA (2016e, 2016f) has concluded that there is suggestive evidence of the carcinogenic potential of PFOA and PFOS in humans. [The International Agency for Research on Cancer] . . . (2017) concluded that PFOA is possibly carcinogenic to humans (Group 2B)."

60.    Additionally, nonhuman receptors exposed to the contaminated environment are at significant risk of harm. PFOA is persistent and can cause adverse effects in laboratory animals, including cancer and developmental and systemic toxicity. PFOS is persistent, bioaccumulative, and toxic to mammalian species. PFOS is linked to developmental, reproductive, and systemic toxicity. PFOA and PFOS are also linked to immune system impacts on certain animal species (which are often used as indicators of the overall health of an ecosystem): elevated mortality in unexposed progeny of freshwater macroinvertebrates with exposure in the parental generation, disruption of the endocrine system in wildlife, and liver toxicity.

61.    PFOA is also readily taken up by plants, including wild plants and crops that are grown on contaminated soil, and lead to further bioaccumulation in the food chain.

62.    The State of Washington has also taken significant steps to regulate PFAS. In October 2021, Ecology announced that it interprets MTCA and related regulations to encompass the entire class of PFAS as hazardous. In July 2022, Ecology published recommended soil and

COMPLAINT AND JURY DEMAND - 15

groundwater cleanup levels for PFOA, PFOS, PFNA, PFHxS, PFBS, and GenX. In addition, the Washington State Legislature passed a bill prohibiting the use of Class B firefighting foam containing PFAS for training purposes.

63.    As of January 1, 2022, the Washington State Board of Health enacted state action levels ("SALs") for five PFAS detected in drinking water: 10 ppt for PFOA; 15 ppt for PFOS; 9 ppt for PFNA; 65 ppt for PFHxS; and 345 ppt for PFBS.

64.    On April 20, 2024, the Washington State Board of Health announced its intention to adopt the federal MCLs via rulemaking, a process that can take up to two years.

65.    On January 6, 2023, the Defense Logistics Agency within the Department of Defense ("DOD") published a new Military Specification for "Fire Extinguishing Agent, Fluorine-Free Foam (F3) Liquid Concentrate, for Land-Based, Fresh Water Application," MIL-PRF-32725 ("F3 MilSpec") in accordance with § 332(a)(1) of the FY 2020 NDAA.[4] This new specification will govern fire extinguishing foams used by all DOD organizations and will require such foams to test "non-detect" for PFAS. The specification further requires manufacturers to "certify in writing that PFAS has not intentionally been added to the concentrate."

**B. Since the 1950s, PFAS-containing products made and sold by Manufacturer Defendants have contaminated the environment.**

66.    Beginning in the 1950s, manufacturers began incorporating PFAS into consumer products.

---

[4]    Available on the Defense Logistics Agency's website, https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=285047.

COMPLAINT AND JURY DEMAND - 16

MARTEN LAW LLP
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

67.     In 1956, 3M began selling Scotchgard, a stain repellent and durable water repellent designed to be applied to textiles, that used PFOS and later PFBS as its primary active ingredients.

68.     On information and belief, Manufacturer Defendants manufactured, distributed, and/or sold PFAS as part of other PFAS-containing products or for inclusion in such products.

**C. Since the 1960s, AFFF has been used and released into the environment.**

69.     In or about 1966, the United States patented AFFF as a method for extinguishing liquid hydrocarbon fires and other fires at military bases, airports, oil refineries, and firefighting training facilities.

70.     In 1969, by command of the Navy Department and Marine Corps, DOD issued military specification MIL-F-24385 (amended subsequently), requiring AFFF liquid concentrate to contain either 3% or 6% PFAS. In MIL-F-24385, DOD refers to 3% AFFF concentrate as "Type 3" and to 6% AFFF concentrate as "Type 6".

71.     In the foam industry, concentrates are typically referred to as "3%" or "6%" concentrate, depending on the mixture rate with water (either 97% or 94%, respectively). AFFF concentrates contain about 60–90% water and have a fluorine content of about 0.3–1.8%.

72.     AFFF and other Class B fluorine-containing firefighting foams have been stored and used for fire suppression of flammable liquid fires, fire training, and flammable vapor suppression at military installations, fire-fighting training facilities, and civilian airports in the United States, including at a location impacting Hannah Heights Property.

73.     AFFF concentrate containing PFAS is stored in above-ground storage tanks, underground storage tanks, and nonstationary containers. To use AFFF stored in this manner, the

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA 98101
Phone (206) 292-2600
Fax (206) 292-2601

concentrate is mixed with water to make a liquid foam solution. The foam solution is then aerated at the nozzle, yielding finished foam that is then ready to be applied to a fire.

74.    AFFF is designed to coat fire, blocking its oxygen supply and creating a barrier to extinguish vapors. A film also forms to smother the fire after the foam has dissipated.

75.    Thousands of gallons of foam solution may be applied during a single AFFF release or discharge.

76.    AFFF has been released into the environment, including, on information and belief, at locations impacting Hannah Heights Property, through a variety of practices and mechanisms including: low volume releases of foam concentrate during storage, transfer, or equipment calibration; moderate volume discharge of foam solution for apparatus testing; and high-volume, broadcast discharge of foam solution for fire training.

77.    Safety Data Sheets ("SDSs" (f/k/a Material Safety Data Sheets ("MSDSs")) require that, after AFFF is released, spilled, discharged, or disposed into the environment, it must be contained so it does not accumulate in sediment, soil, surface water, sewers, or groundwater.

78.    If it is not contained, AFFF reverts from foam to the liquid solution of PFAS and water, and accumulates in sediment, soil, surface water, sewers, and groundwater.

**D. Manufacturer Defendants supplied AFFF to the Fire District.**

79.    Defendant 3M does business throughout the United States and is registered to do business in Washington. It developed, designed, manufactured, marketed, sold, and distributed AFFF from approximately 1964 through at least 2002. Defendant 3M specifically produced the chemical PFOS for use in AFFF and other PFAS-containing products. For the majority of its business manufacturing and distributing PFAS chemicals to companies for use in AFFF and

COMPLAINT AND JURY DEMAND - 18

other PFAS-containing products, 3M has been the sole US manufacturer of PFOS. Defendant 3M's PFOS was used in AFFF purchased for fire training and response at locations throughout the country, including, on information and belief, the Fire House where AFFF was released and has impacted Hannah Heights Property.

80.     Defendant Tyco (successor in interest to Ansul) does business throughout the United States, including in Washington. Tyco, Ansul, and National Foam developed, designed, manufactured, marketed, sold, and distributed AFFF to firefighting training entities and facilities and other locations throughout the United States. After Tyco acquired Ansul in the 1990s, it continued to produce, distribute and sell Ansul and Ansulite AFFF products.

81.     Defendant BASF does business throughout the United States, including in Washington. BASF is the successor-in-interest of Ciba Inc., which manufactured, distributed, and sold fluorosurfactants containing PFAS to AFFF manufacturers, including Ansul and Chemguard, from the 1970s to 2003. Ciba sold its fluorosurfactant business to Chemguard in 2003 but retained pre-2003 liabilities. In July 2009, BASF acquired Ciba, retaining all Ciba liabilities. Ciba supplied Tyco with fluorosurfactants that Tyco utilized in its manufacture of AFFF. Ciba, and by association, BASF, acted as a partner to Tyco in bringing Tyco's Ansul and Ansulite products to market, and played an integral role in the development of Tyco's AFFF.

82.     Fire drill logs documenting Fire District training activities at the Fire House show the Fire District used AFFF in its training activities from as early as 1992 to around 2018.

83.     Records to date show the Fire District regularly purchased AFFF, specifically Ansul and Ansulite products, from L.N. Curtis & Sons between 2006 and 2016. Washington

COMPLAINT AND JURY DEMAND - 19

Department of Health employees found containers of Ansulite 3% inside the Fire House as recently as 2023. Ansulite 3% is a Class B AFFF foam.

84.    Ansul and Ansulite are Tyco brand products.

85.    Ansul and Ansulite have been documented as containing PFOS.

86.    PFAS contained in the AFFF the Fire District purchased is a source of contamination of Hannah Heights Property.

**E. Manufacturing Defendants knew and failed to provide notice that PFAS and PFAS-containing products are toxic.**

87.    PFAS development began with 3M in the 1940s. At that time, 3M's Central Research Laboratory worked with Joseph H. Simons, a scientist at Penn State University, who had developed and patented a process of preparing fluorine compounds through electrochemical fluorination ("ECF").

88.    In 1945, 3M acquired Mr. Simons' ECF patents. Three years later, 3M's Central Research developed fluorinated compounds that could be used for commercial applications. During that time, 3M scientists continuously researched and created new fluorochemicals; in the words of one researcher, "[a]lmost every day we made a new molecule which had never been made on the face of the earth before."[5]

89.    Even in the early days of its fluorochemical research, 3M recognized the characteristics that make PFAS persistent pollutants in the environment. For example, Simons' 1948 patent for the ECF process, which was assigned to 3M, stated that the compounds produced through ECF are non-corrosive, and of little chemical reactivity, and do not react with any of the metals at ordinary temperatures and react only with the more chemically reactive metals such as

---

[5] Neil McKay, A Chemical History of 3M: 1933-1990.https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1365.pdf.

COMPLAINT AND JURY DEMAND - 20

sodium, at elevated temperatures. The patent also stated that the fluorochemicals produced by the ECF process do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule. [6]

90.     Defendant 3M understood that the stability of the carbon-to-fluorine bonds prevented its fluorosurfactants from undergoing further chemical reactions or degrading under natural processes in the environment.[7]

91.     The thermal stability of 3M's fluorosurfactants was also understood prior to commercial production. Simons' patent application further discloses that the fluorosurfactants produced by the ECF process were thermally stable at temperatures up to 750° C (1382° F). Additional research by 3M expanded the understanding of the thermal stability of perfluorocarbon compounds.[8]

92.     In 1949, 3M built its first manufacturing facility to expand ECF from laboratory research to commercial production, and it began to present its fluorochemical research to find potential uses and customers for these compounds.

93.     Even in 1950, 3M's research had already documented that PFAS accumulate in the blood of mice exposed to the chemicals in laboratory tests.[9]

94.     A 1956 study at Stanford University concluded that the PFAS manufactured by 3M binds to proteins in blood.

---

[6] Simons, J. H., Fluorination of Organic Compounds, U.S. Patent No. 2,447,717. August 24, 1948, https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1005.pdf.
[7] Simons, J. H., 1950. Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422,https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3008.pdf.
[8] Bryce, T. J., 1950. Fluorocarbons - Their Properties and Wartime Development. FluorineChemistry, 1(13): 423-462.
[9] 1950 3M test study results with Perfluorobutyric acid, https://static.ewg.org/reports/2019/pfa-timeline/1950_Mice.pdf?_ga=2.21758526.426747500.1673645134-2012946541.1673645134.

COMPLAINT AND JURY DEMAND - 21

95.     On information and belief, by the early 1960s, 3M also understood that PFAS are stable, persist in the environment, and do not degrade.

96.     One 3M employee wrote in 1964, "This chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon."[10] Thus, 3M knew by the mid-1960s that its fluorosurfactants were immune to chemical and biological degradation in soils and groundwater.

97.     Defendant 3M also knew by 1964 that fluorocarbon carboxylic acids and fluorocarbon sulfonic acids, when dissolved, dissociated to form highly stable perfluorocarboxylate and perfluorosulfonate ions. Later studies by 3M on the adsorption and mobility of FC-95 (the potassium salt of PFOS) and FC-143 (the ammonium salt of PFOA) in soils indicated very high solubility and very high mobility in soils for both compounds.[11]

98.     By the end of the 1960s, additional research and testing performed by 3M indicated that fluorosurfactants, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

99.     In 1970, the authors of a scientific journal article conducted tests on a 3M product that contained PFAS and observed that it was "highly derogatory to marine life"; "the entire test program had to be abandoned to avoid severe local stream pollution."

100.     In 1975, independent toxicologists Drs. Warren Guy and Donald Taves reported that a then-unknown organic fluorine compound had been found widely in human blood samples

---

[10] Bryce, H.G., Industrial and Utilitarian Aspects of Fluorine Chemistry (1964), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf.
[11] Technical Report Summary re : Adsorption of FC 95 and FC143 on Soil (Feb. 27, 1978), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1158.pdf.

COMPLAINT AND JURY DEMAND - 22

from different blood banks. The toxicologists contacted 3M about "potential sources" for the chemical, but 3M "pleaded ignorance" and claimed to adopt a position of "scientific curiosity and desire to assist in any way." Dkt. 2601 at 15. The toxicologists ultimately published their research in Science, identifying the organic fluorocompounds as "derived from commercial products." Id.

101.    Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than previously believed."

102.    In 1975, 3M scientist Richard Newmark authored an internal company report stating that the fluorine compound found in blood bank samplings "resembled most closely" PFOS, a chemical manufactured by 3M and used in 3M's AFFF product. Id.

103.    In 1976, a team headed by 3M scientists Don Hagan and Jon Belisle confirmed that "Guy and Taves' spectra reflects the presence of PFOS." Id. at 16. But in 1981, Jon Belisle published an article in Science stating that the compound that was the subject of the Guy and Taves article was not man-made, but rather a naturally occurring substance. Id.

104.    Despite early warnings of the toxic, persistent, and bioaccumulative nature of PFOS and PFOA, these chemicals began to be used in a product that would be released in large quantities directly into the environment whenever used: firefighting foam.

105.    A 1978 study by 3M on PFOA and PFOS specifically confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

106.    In 1979, a 3M scientist recognized that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

COMPLAINT AND JURY DEMAND - 23

107.    In 1979, an internal company document showed PFOS were "water soluble," "resistant to microbial degradation," "highly mobile" in soil, and likely to end up in "waterways" as an "environmental sink for the product." Id. at 19.

108.    In the 1970s, 3M began a major program to review personnel handling of fluorochemicals. 3M's monitoring confirmed that fluorochemicals could bioaccumulate.

109.    The potential loss of profits drove 3M to engage in a deliberate campaign to influence the science relating to PFAS and, according to internal company documents, to conduct scientific "research" that it could use to mount "defensive barriers to litigation."

110.    Despite 3M's research in the 1970s through the 1990s, 3M did not disclose any information on the health or environmental effects of PFOS outside the company. Instead, an internal document stated, "3M lawyers urge [Central Analytical Laboratory] not to release the true identity (PFOS) of the compound." Id. at 16.

111.    A key priority of an internal 3M committee was to "[c]ommand the science" concerning the "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

112.    In exchange for providing grant money to researchers, 3M obtained the right to review and edit drafts of papers on PFAS and sought control over when and whether these papers were published at all.

113.    From the 1970s onward, 3M conducted over a thousand studies on the properties of PFOS but never disclosed those studies to EPA or outside the company. Before 1998, 3M had released only 84 such studies. After 1998, 3M made long overdue disclosures of over 1,200

COMPLAINT AND JURY DEMAND - 24

additional studies, leading EPA to fine 3M $1.5 million for withholding reports that "produced valuable, previously unreported information that will help the scientific community to better understand the presence of toxic substances in the environment." Id. at 17.

114.    A 1985 literature survey by NOSC concluded that "usage of AFFF and the disposal of AFFF-laden wastewater have the potential for an adverse impact on the environment -- these foams are potentially toxic due to the fluorocarbons and surfactants." NOSC references toxicity studies showing impacts on a variety of organisms in the 1970s and 1980s. It also analyzes several studies conducted by 3M in 1980 showing AFFF's lethality at various concentrations across a 96-hour timeframe. NOSC concludes these "earlier studies demonstrated that a wide range of toxic concentrations exist for a variety of organisms."

115.    In 1988, a 3M environmental specialist wrote in an internal memo, "I don't think it is in 3M's long-term interest to perpetuate the myth that these fluorochemical surfactants are biodegradable. It is probable that this misconception will eventually be discovered, and when that happens, 3M will likely be embarrassed, and we and our customers may be fined and forced to immediately withdraw products from the market." Id.

116.    In 1998, 3M revealed PFOS was in the blood of the general population, but it assured the public PFOS was safe. Internally, however, 3M's Manager of Corporate Toxicologist, Dr. John Butenhoff, wrote about the need to "replace PFOS-based chemistry as these compounds [are] VERY persistent and thus insidiously toxic." Id. Dr. Butenhoff considered a safe level of PFOS in blood to be 1.05 ppb. Id.

117.    From the late 1960s to 2002, Defendant 3M manufactured and sold AFFF containing PFOS under the brand name "Light Water."

COMPLAINT AND JURY DEMAND - 25

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA 98101
Phone (206) 292-2600
Fax (206) 292-2601

118.    Under pressure from EPA, on May 16, 2000, 3M announced it would phase out production of two synthetic chemicals, PFOS and PFOA, which it had developed more than 50 years earlier. On information and belief, 3M ceased production of PFOS based AFFF in 2002.

119.    An EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term. [PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree."

120.    In contrast, 3M stated in its news release on the same event that "our products are safe," while extolling their "principles of responsible environmental management" as driving the decision to cease their production.

121.    As part of the multi-year phase-out, 3M engaged in a damage-control campaign to influence its customers' reactions to the phase-out and encourage them to continue buying its toxic, and therefore useless, PFOS- and PFOA-based products during the phase-out period and, on information and belief, possibly longer.

122.    Manufacturer Defendants had a duty, which they breached, to notify EPA when they had reason to believe that a substance or mixture—such as PFAS—presented a substantial risk of injury to health or the environment.

123.    Manufacturer Defendants treated their foam formulations as proprietary information and did not disclose the specific chemical ingredients of their formulations to government agencies or the public.

COMPLAINT AND JURY DEMAND - 26

**Marten Law LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

124.    Manufacturer Defendants understood how stable the fluorinated surfactants used in AFFF are when released into the environment from its first sale to a customer, yet they failed to warn their customers or provide reasonable instruction on how to manage wastes generated from their products.

125.    Before about 1983, no containment measures were listed in MSDSs, nor were the dangers to health or the environment inherent in AFFF disclosed in the instructions, warning labels, or product packaging for AFFF.

126.    By about 1983, MSDSs for certain AFFF products directed users to collect AFFF before discharging to a wastewater treatment system and/or to contain liquid materials containing PFAS to prevent spilled material from reaching sewers or waterways.

127.    By 2010, SDSs for certain AFFF products directed users to contain accidental releases by stopping the flow of the material, utilizing a dike for the spilled material, and preventing entry into waterways, sewers, basements, or confined spaces. For large spill releases, SDS procedures required diking the spill for later disposal; use of noncombustible materials such as vermiculite, sand, or earth to soak up the product; and containerizing the product for later disposal.

128.    By 2010, following product recovery, SDS procedures for certain AFFF products required flushing the area with water and cleaning the surface thoroughly to remove residual contamination. MSDSs for some AFFF products provided instructions for users not to release AFFF to local wastewater treatment plant without permission.

129.    Between about 1983 and the present, the MSDSs and SDSs, instructions, warning labels, and product packaging did not fully describe or adequately warn users of AFFF health

COMPLAINT AND JURY DEMAND - 27

and environmental risks, or of all precautions they should take—risks and precautions that Manufacturer Defendants knew or should have known existed or were necessary.

130.     In the 1970s, 3M began making AFFF that included shorter carbon chain PFAS. On information and belief, those other PFAS also are highly soluble, persistent, bioaccumulative, and toxic to humans.

131.     In 2006, EPA initiated a "PFOA Stewardship Program" with an ultimate goal of phasing out the use of AFFF Products containing PFOA by 2015. EPA asked "the eight major companies in the PFASs industry" to commit to eliminate PFOA from their products by 2015. These companies were Arkema, Asahi Glass Co. (predecessor to AGC, Inc.), BASF, Clariant, Daikin, 3M, Old DuPont, and Solvay Solexis. The PFOA Stewardship Program was widely publicized, and all eight companies made public promises to phase out their use of PFOA by 2015.

132.     In 2009, EPA announced a Long-Chain Perfluorinated Chemicals Action Plan that discussed the agency's intent to go beyond the PFOA Stewardship Program and pursue the elimination of "long-chain PFCs" (which include PFOA and other PFAS chemicals) from all manufacturers' products, as well as other goals related to eliminating many other types of PFAS.

133.     Manufacturer Defendants were aware of EPA's PFOA phase-out program and took steps during the phase-out period to replace their existing foam products, which used PFAS with eight or more carbon atoms, such as PFOA ("Long Chain PFAS"), with products that used fewer than eight carbon atoms ("Short Chain PFAS").

134.     On information and belief, Manufacturer Defendants had reason to believe their Long Chain PFAS-containing foam products would be unmarketable after the 2015 phase-out

MARTEN LAW LLP
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

deadline, yet continued to market, sell, and provide instructions for the use of Long Chain AFFF Products throughout the PFOA Stewardship Program and other EPA actions aimed at eliminating PFAS use, in order to offload inventory that was or would soon be rendered valueless by regulatory pressure and environmental and health concerns.

135.    On information and belief, existing stocks of PFOA and PFOS may still be used, and PFOA and PFOS may be contained in some imported articles.

136.    In the 1970s, Manufacturer Defendants began making AFFF that included shorter carbon chain PFAS. Those other PFAS also are highly soluble, persistent, bioaccumulative, and toxic to humans.

137.    Short Chain PFAS also accumulate in blood and other tissues and will persist indefinitely in the environment, posing threats to the environment and health.

138.    Short Chain PFAS are also difficult to remove from the environment and can break through carbon filtration systems, possibly more easily than Long Chain PFAS.

139.    On information and belief, Manufacturer Defendants knew AFFF and other PFAS-containing products developed with Short Chain PFAS were still harmful and viewed such products as a stopgap measure to enable their continued sales even as they understood the industry was moving towards PFAS-free foams.

140.    On information and belief, there are at least 24 firefighting foam products currently on the market that do not contain PFAS, including products manufactured by Angus Fire LTD., Auxquimia, S.A.U., Dafo Fomtec AB, and The Solberg Company, which are economically and technologically feasible.

COMPLAINT AND JURY DEMAND - 29

141.    In 2018, the State of Washington passed the Firefighting Agents and Equipment law, which prohibits any person, local government, or state agency from discharging or otherwise using for training purposes class B firefighting foam that contains intentionally added PFAS chemicals. RCW 70A.400.010. Before this law was passed, however, Fire Districts like San Juan County Fire District No. 3 were permitted to discharge class B (AFFF) firefighting foam for training purposes.

**F. The Fire District used and released AFFF at the Fire House.**

142.    The Fire House is located at 3189 Bailer Hill Road, Friday Harbor, Washington 98250. The Fire House is within 50 feet of Well 2, which has supplied roughly 70-80% of Hannah Heights' drinking water.

143.    Fire District personnel used AFFF in training exercises and other activities at the Fire House.

144.    The Fire District discharged and disposed spent AFFF to the environment at and around the Fire House. The Fire District's discharge and disposal of spent AFFF, including its PFAS components, includes, but is not limited to, releases and discharges into soil and water pathways that impact Hannah Heights property.

145.    The Fire District conducted AFFF training at the Fire House from at least 1992 to 2018. The training consisted of AFFF application demonstrations, where firefighters would apply the foam "to the ground", "against a wall, tank, or similar object," and "into the air…and allowed to float down onto the fuel." Training guidance also directed the Fire District to set up a simulated fuel spill and/or fire and have the firefighters respond to the location by applying AFFF.

COMPLAINT AND JURY DEMAND - 30

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

146.    On information and belief, the Fire District discharged AFFF to the soil and groundwater at and around the Fire House, as was standard practice for such training activities.

**G. Hannah Heights has been damaged by Defendants' actions, and that damage is ongoing.**

147.    Due to Manufacturing Defendants' manufacture, marketing, sale, and distribution of AFFF and other PFAS-containing products, and the Fire District's storage, handling, use, and uncontrolled disposal of AFFF at the Fire House, Hannah Heights has suffered injury to its property and economic injury.

148.    On information and belief, the Fire District, and its employees, and personnel, operated at and used the Fire House. The Fire District is now and has been responsible for activities and operations at the Fire House.

149.    The Fire District stored AFFF at the Fire House.

150.    The Fire District used AFFF at and around the Fire House.

151.    The Fire District discharged and disposed of PFAS into the environment, including by spraying, storing, and placing AFFF on land and in water at and around the Fire House.

152.    Groundwater from and beneath the Fire House flows into and is connected to Hannah Heights' drinking water wells.

153.    PFAS released at and around the Fire House have contaminated Hannah Heights' real property, water rights, wells, and systems, impairing Hannah Heights' water rights.

154.    The PFAS contamination prevents Hannah Heights from fully utilizing its property, including its water rights and wells at and in the vicinity of the Fire House.

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

155.    Hannah Heights tested its Well 2 in May 2023. Testing identified five PFAS chemicals at levels exceeding the respective SALs and MCLs issued by the Washington Department of Health and EPA under WAC 246-290 and the Safe Drinking Water Act: PFOS, PFHxS, PFOA, PFNA, and PFBS. Of these, PFOS was detected at 9400 ppt, two thousand three-hundred and fifty times EPA's 4 ppt MCL and over six-hundred and twenty-six times the 15 ppt SAL; PFHxS at 7550 ppt, seven hundred and fifty-five times the 10 ppt MCL and over one-hundred and sixteen times the 65 ppt SAL; and PFOA at 373 ppt, over ninety-three times the 4 ppt MCL and over thirty-seven times the 10 ppt SAL. These levels are believed to be the highest encountered to date in a Washington public water system.

156.    Hannah Heights has historically relied on meeting its total water supply requirements through its rights to groundwater in its Well 2, located immediately adjacent to, and downhill from, the Fire House. Because PFAS levels in groundwater at Hannah Heights' Well 2 exceeded the Health Advisory limits, however, Hannah Heights shut down this well in 2023. It therefore cannot fully utilize its groundwater and other property rights.

157.    Hannah Heights has been actively seeking options for alternative water sources and treatment systems. Hannah Heights has had water trucked into the neighborhood and brought its Well 3 online to supplement drinking water supplies while the contaminated Well 2 is offline, so it can receive and deliver uncontaminated water to its residential customers. Hannah Heights pays for the water it has been trucking into the area to partially and temporarily replace its contaminated groundwater supply. But for the PFAS contamination, Hannah Heights would not have incurred these costs. Hannah Heights may require a substitute water supply if it cannot bring Well #2 back online due to contamination.

COMPLAINT AND JURY DEMAND - 32

158.    Hannah Heights has also pursued procuring well easements to drill outside the neighborhood where potential water sources exist, but these efforts have been unsuccessful due to limited water supplies. As there are few other areas within the Hannah Heights neighborhood where a well could provide an adequate water supply, Hannah Heights has also been seeking treatment options for Well 2, or any other new well that may need to be drilled in the contaminated area before the area is fully remediated.

159.    Hannah Heights' additional water costs as a water provider include but are not limited to: assure water quality in compliance with mandatory federal MCLs; sample and analyze water and other media for PFAS; respond to public inquiries and manage public relations regarding the contamination; assess future costs of water treatment that include installing, operating, and maintaining filtration systems; conduct pilot study for new treatment system; increase the frequency of water quality testing and monitoring; and construct a new water system and related distribution system.

160.    Hannah Heights cannot rely on alternative water sources to replace its lost water sources indefinitely. Its lack of alternative options reduces Hannah Heights' ability to weather a drought.

161.    The PFAS contamination caused by Defendants is not contained and continues to concentrate in Hannah Heights property and groundwater supplies.

162.    If Hannah Heights' contaminated property and water sources are not remediated, PFAS contamination will continue to impact Hannah Heights property and water rights far into the future due to the nature of PFAS, as described above.

COMPLAINT AND JURY DEMAND - 33

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

## VI.     FIRST CLAIM FOR RELIEF – MTCA AND DECLARATORY JUDGMENT (MANUFACTUING DEFENDANTS AND DEFENDANT FIRE DISTRICT)

163.     Hannah Heights incorporates all averments in this Complaint as if restated fully herein.

164.     Defendants are persons as defined in RCW 70A.305.020(24).

165.     Under RCW 70A.305.020(13), the PFAS disposed of, deposited, and/or handled at the Fire House are "hazardous substances," as all types of PFAS are "hazardous substances" under MTCA. WAC 173-303-090—100.[12]

166.     A release is "any intentional or unintentional entry of any hazardous substance into the environment, including but not limited to the abandonment or disposal of containers of hazardous substances." Wash. Admin. Code § 173-340-200. The use of hazardous substances at the Fire House and other locations in Hannah Heights where AFFF was released constituted, and continue to constitute, releases for which remedial investigation and action has been and will continue to be necessary at the facility within the meaning of RCW 70A.305.040(1)(e).

167.     During the period of the Fire District's operation of the Fire House, "releases" of "hazardous substances" occurred from the Fire House, as these terms are respectively defined in RCW 70.105D.020(32) and (13).

168.     The Fire House and every place at which AFFF and other PFAS-containing products originating from the Fire House came to be located on Hannah Heights Property, including its drinking water supplies to which Hannah Heights has rights, constitute "facilities" as defined in RCW 70A.305.020(8).

---

[12] *See also* Wash. Dep't of Ecology, *Focus on PFAS*, Pub. No. 21-09-060 (Oct. 2021), https://apps.ecology.wa.gov/publications/documents/2109060.pdf.

COMPLAINT AND JURY DEMAND - 34

MARTEN LAW LLP
1191 Second Avenue, Suite 2200
Seattle, WA 98101
Phone (206) 292-2600
Fax (206) 292-2601

169.    The Fire District currently operates at and at all relevant times operated at the facilities within the meaning of RCW 70.105D.040(1)(a) and RCW 70.105D.020(22) when PFAS were released into the environment at and around the facilities.

170.    In purposefully discharging AFFF on Hannah Heights Property for decades without taking adequate measures to contain AFFF or the PFAS therein, the Fire District also arranged for disposal of AFFF containing PFAS with the intent to dispose of the AFFF.

171.    The Fire District is therefore a "person" liable under RCW 70.305.040(1)(e).

172.    Manufacturing Defendants are persons who owned or possessed PFAS, hazardous substances, and who by contract, agreement, or otherwise arranged for disposal or treatment of the hazardous substance at the Fire House and every place at which AFFF came to be located on Hannah Heights Property.

173.    Manufacturing Defendants are also persons who sold hazardous substances and, on information and belief, were responsible for written instructions for their use within the meaning of RCW 70A.305.040(1)(e).

174.    On information and belief, the releases of hazardous substances at the Fire House and other locations throughout Hannah Heights where AFFF was released occurred according to the instructions provided by Manufacturing Defendants.

175.    Manufacture Defendants are therefore each a "person" liable under RCW 70.305.040(1)(e).

176.    These releases caused and will continue to cause Hannah Heights to take and/or fund "remedial actions" as defined in RCW 70A.305.020(33).

COMPLAINT AND JURY DEMAND - 35

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA 98101
Phone (206) 292-2600
Fax (206) 292-2601

177.    These remedial actions are and will continue to be, when evaluated as a whole, substantially equivalent to remedial action conducted or supervised by Ecology.

178.    The Fire District's releases of hazardous substances at the facility have resulted in Hannah Heights incurring remedial action costs and attorneys' fees, and have further resulted in Hannah Heights' need to incur future costs, including attorneys' fees, as a result of those actions.

179.    Manufacturing Defendants' sale of hazardous substances and provision of instructions on the use of said substances have resulted in Hannah Heights incurring remedial action costs and have further resulted in Hannah Heights' need to incur future costs, including attorneys' fees, as a result of those actions.

180.    Pursuant to RCW 70A.305.040(2) and RCW 70A.305.080, Defendants are strictly, jointly, and severally liable for any and all past and future costs related to the investigation and remediation of hazardous substances released at or from the facility, including any costs or attorneys' fees relating to releases or threatened releases of hazardous substances at, on, or from the facility.

181.    Under RCW 70A.305.080 and RCW 7.24.010, Hannah Heights is entitled to a declaratory judgment that Defendants are strictly and jointly and severally liable for any and all past and future costs related to the investigation and remediation of hazardous substances released at the facility, including any costs or attorneys' fees incurred by Hannah Heights relating to releases or threatened releases of hazardous substances at, on, or from the facility.

## VII.    SECOND CLAIM FOR RELIEF – COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT (MANUFACTUING DEFENDANTS AND DEFENDANT FIRE DISTRICT)

182.    Hannah Heights incorporates all averments in this Complaint as if restated fully herein.

COMPLAINT AND JURY DEMAND - 36

183.    Manufacturing Defendants and Defendant Fire District are "persons," as defined by CERCLA § 101(21), 42 U.S.C. § 9601(21).

184.    The Fire House and other locations that PFAS has come to be located on and in Hannah Heights Property are "facilities," as defined by CERCLA § 101(9), 42 U.S.C. § 9601(9).

185.    PFOA and PFOS are "hazardous substances" under CERCLA, 42 U.S.C. § 9601(14); see 42 U.S.C. § 6921.

186.    Other PFAS are expected to constitute hazardous substances once they are designated as hazardous wastes under RCRA. 42 U.S.C. § 9601(14) ("hazardous substances" include "any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921]."); 42 U.S.C. § 6921 (listing characteristics of "hazardous wastes" under RCRA); 42 U.S.C. § 6903(5) (same). That is, PFAS beyond just PFOA and PFOS "cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness" and "pose a substantial present or potential hazard to human health or the environment" because they have been "improperly treated, stored, transported, or disposed of, or otherwise managed."

187.    The Fire District currently operates at and at all relevant times operated at the facilities when PFAS were released into the environment at and around the facilities, as defined by CERCLA § 101(9), 42 U.S.C. § 9601(9).

188.    In purposefully discharging AFFF on Hannah Heights Property for decades without taking adequate measures to contain AFFF or the PFAS therein, the Fire District also arranged for disposal of AFFF containing PFAS with the intent to dispose of the AFFF.

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

189.    The Fire District is therefore a "person" liable under CERCLA § 107(a)(1)-(3), 42 U.S.C. § 9607(a)(1)-(3).

190.    Manufacturing Defendants arranged for the disposal of PFAS from locations within Hannah Heights, by designing, manufacturing, marketing, selling, and providing instructions for the use of AFFF and other PFAS-containing products with the knowledge and specific intent that such products were hazardous and would be disposed into the environment in the course of the products' typical use.

191.    On information and belief, Manufacturer Defendants continued to design, manufacture, market, sell, and provide instructions for the use of AFFF products after and despite becoming aware of the nature of PFAS in AFFF as hazardous substances.

192.    On information and belief, Manufacturing Defendants knew that their PFAS-containing products were harmful to humans and the environment and intentionally shielded that information from others.

193.    On information and belief, Manufacturing Defendants continued selling PFAS-containing products despite the environmental risks of which they were aware during phase-out periods.

194.    While doing so, Manufacturing Defendants were aware that their AFFF and other PFAS-containing products were likely to be globally phased out of the U.S. market under pressure from EPA, yet continued to sell these products with the intent to dispose of them before anticipated regulatory actions would have precluded such sales.

195.    Defendant 3M in 2000 announced it would cease production and use of PFOS and PFOA. At this time, 3M knew or should have known that its products containing these chemicals

COMPLAINT AND JURY DEMAND - 38

MARTEN LAW LLP
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

posed serious environmental risks that, if known by the entities to whom 3M sold its products, would likely have caused some of those buyers to decline to buy 3M's products.

196.    During the period in which 3M had knowledge of the serious risks posed by its PFAS-containing AFFF, including the period following 3M's 2000 announcement of the phase-out, disposal was, on information and belief, a primary benefit to 3M in selling its AFFF products. Revenues from AFFF sales were incidental to the primary benefit of disposing of hazardous substances at no cost.

197.    On information and belief, Defendants Tyco and BASF also knew or should have known that their AFFF products containing PFAS posed serious environmental risks that, if fully understood by its customers, would have either precluded or at minimum reduced their sales of these products.

198.    On information and belief, before and during the EPA PFOA Stewardship Program under which PFOA manufacturing and use was phased out in the United States, Manufacturer Defendants were aware that their Long Chain PFAS-containing foams would become unmarketable and/or unsaleable after the 2015 phase-out deadline.

199.    On information and belief, given their knowledge of environmental risks posed by their products and the impending phase-out deadline for PFOA, disposal of excess inventory of unusable hazardous substances was a primary goal and benefit to Manufacturer Defendants as they continued to sell these products during this period.

200.    Manufacturing Defendants are each therefore a "person" liable under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

COMPLAINT AND JURY DEMAND - 39

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

201.    Manufacturing Defendants' and the Fire District's disposal of PFAS are "releases" within the meaning of CERCLA § 101(22), 42 U.S.C. § 9601(22), and have resulted in the contamination of Hannah Heights Property.

202.    Manufacturing Defendants and the Fire District are responsible for PFAS releases that have caused Hannah Heights to incur, and continue to incur, "response costs" within the meaning of CERCLA §§ 101(23)-(25), 42 U.S.C. §§ 9601(23)-(25).

203.    All such costs are necessary and consistent with the National Contingency Plan. 40 CFR Pt. 300. As described elsewhere, Hannah Heights' response is commensurate to the public health threat and treatment needs posed by PFAS contamination of Hannah Heights' water supplies. In addition, all response costs for which Hannah Heights seeks recovery were or will be incurred through a decision-making process guided by a preliminary assessment/site inspection, field sampling plan, quality assurance project plan, and engineering evaluation/cost analysis, or the substantial equivalents thereof.

204.    Hannah Heights is entitled to full reimbursement from Manufacturing Defendants and the Fire District for all such response costs, pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), as well as a declaratory judgment under CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), of liability for response costs that will be binding in any subsequent action to recover further response costs.

205.    Accordingly, Defendants are strictly, jointly, and severally liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), for all response costs incurred by Hannah Heights.

COMPLAINT AND JURY DEMAND - 40

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

## VIII.  THIRD CLAIM FOR RELIEF – NEGLIGENCE (MANUFCTURING DEFENDANTS AND DEFENDANT FIRE DISTRICT)

206.    Hannah Heights hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

207.    Defendants negligently discharged and disposed of PFAS and are failing to remediate PFAS contamination.

208.    In Washington, a defendant is negligent when the defendant owes a duty to the plaintiff, the defendant breaches that duty, and the defendant's breach causes injury to the plaintiff. Keller v. City of Spokane, 44 P.3d 845, 848 (Wash. 2002).

209.    Manufacturing Defendants had a duty to manufacture and/or market, distribute, and sell their AFFF and other PFAS-containing products in a manner that avoided contamination of the environment, including municipal water supplies, and avoided harm to those who would foreseeably come into contact with its chemical components.

210.    Manufacturing Defendants knew or should have known that the manufacture of AFFF and other PFAS-containing products was hazardous to human health and the environment.

211.    Manufacturing Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture AFFF and other PFAS-containing products using PFAS because it was highly probable that the chemicals would migrate into the environment, including the environment at the Fire House and other locations impacting Hannah Heights Property, and contaminate groundwater used as a public water supply and other locations.

212.    Knowing of the dangerous and hazardous properties of AFFF and other PFAS-containing products, Manufacturing Defendants had the duty to warn of the hazards of consuming water containing PFAS.

COMPLAINT AND JURY DEMAND - 41

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

213.    Hannah Heights was a foreseeable victim of the harm caused by the chemical components of Manufacturing Defendants' AFFF and other PFAS-containing products.

214.    Manufacturing Defendants negligently designed, engineered, developed, fabricated, and tested AFFF and other PFAS-containing products, negligently manufactured, and/or distributed and sold AFFF and other PFAS-containing products, and negligently created the associated warnings and instructions.

215.    Manufacturing Defendants thereby failed to exercise reasonable care to prevent AFFF and other PFAS-containing products and their components from presenting an unreasonable risk to the health of persons who would come in contact with them. Manufacturing Defendants also failed to exercise reasonable care to prevent contamination of public water supplies, including Hannah Heights' water supply.

216.    Manufacturing Defendants' negligent design, engineering, development, fabrication, testing, warnings, and instructions constitute a pattern of continuous and ongoing tortious conduct.

217.    Manufacturing Defendants have engaged and continue to engage in discrete acts of negligent design, engineering, development, fabrication, testing, warnings, and instructions.

218.    On information and belief, Manufacturing Defendants have not recalled their AFFF and other PFAS-containing products.

219.    Manufacturing Defendants' breaches of their legal duties have caused PFAS to contaminate the groundwater used by Hannah Heights for supplying drinking water.

220.    Manufacturing Defendants have caused, and will continue to cause, damage to Hannah Heights Property due to their negligent manufacture and/or distribution and sale of

MARTEN LAW LLP
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

AFFF and other PFAS-containing products, as well as their negligent misrepresentation and failure to warn regarding the dangers of PFAS.

221.    Defendant Fire District had a duty to store, handle, and properly dispose of the AFFF it used for training purposes in a manner that avoided contamination of the environment, including Hannah Heights' water supplies, and avoided harm to those who would foreseeably come into contact with its chemical components.

222.    Defendant Fire District negligently stored, used, handled, and released AFFF during training events and other activities at the Fire House on Hannah Heights Property.

223.    Hannah Heights was a foreseeable victim of the harm caused by the Fire District's negligent storage, use, handling, and release of AFFF during training events and other activities at the Fire House on Hannah Heights Property.

224.    Defendant Fire District thereby failed to exercise reasonable care to prevent AFFF and its components from presenting an unreasonable risk to the health of persons who would come in contact with them. The Fire District also failed to exercise reasonable care to prevent contamination of public water supplies, including Hannah Heights' water supply.

225.    Defendant Fire District's breaches of its legal duties have caused PFAS to contaminate the groundwater used by Hannah Heights for supplying drinking water.

226.    Defendant Fire District has caused, and the impacts of its negligent acts will continue to cause, damage to Hannah Heights Property due to its negligent storage, use, and handling of AFFF during training events and other activities at the Fire House on Hannah Heights Property.

COMPLAINT AND JURY DEMAND - 43

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA 98101
Phone (206) 292-2600
Fax (206) 292-2601

227.    Defendants' negligent, reckless and/or intentional acts and omissions alleged herein contaminated Hannah Heights' water supplies with PFAS.

228.    Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights and property of Hannah Heights.

229.    Defendants' conduct, and the resulting contamination of Hannah Heights Property by the chemical components of AFFF, has caused and will continue to cause Hannah Heights to incur significant costs.

230.    Hannah Heights' costs include but are not limited to those to: assure water quality in compliance with mandatory federal MCLs; sample and analyze water and other media for PFAS; respond to public inquiries and manage public relations regarding the contamination; assess future costs of water treatment that include installing, operating, and maintaining filtration systems; conduct a pilot study for a new treatment system; increase the frequency of water quality testing and monitoring; construct a new water system and related distribution system; manage and dispose of other media; and additional response costs necessary for Hannah Heights to address the PFAS contamination affecting its property and rights.

## IX.    FOURTH CLAIM FOR RELIEF – DEFECTIVE PRODUCT – FAILURE TO WARN (MANUFACTURING DEFENDANTS)

231.    Hannah Heights hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were fully set forth herein.

232.    This cause of action is brought pursuant to Washington State statutory law to include but not limited to Chapter 7.72 RCW.

233.    Under Washington State law, "a product manufacturer is subject to liability…if the claimant's harm was proximately caused by the negligence of the manufacturer in that the

COMPLAINT AND JURY DEMAND - 44

product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided." RCW 7.72.030(1).

234.    Although RCW 7.72.030(1) expresses a negligence liability standard, the Washington State Supreme Court has held that "[t]he adequacy of a manufacturer's warnings are to be measured under Washington's strict liability test." Taylor v. Intuitive Surgical, Inc., 389 P.3d 517, 528 (Wash. 2017) (applying strict liability standard established in Restatement (Second) of Torts § 402A (Am. Law Inst. 1965) to failure to warn claim).

235.    A product is not reasonably safe due to inadequate warnings or instructions if "at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate and the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate." RCW 7.72.030(1)(b).

236.    Where a manufacturer learned, or where a reasonably prudent manufacturer should have learned, about a danger connected with the product after it was manufactured, and did not then provide adequate warnings or instructions, the product is not reasonably safe. RCW 7.72.030(1)(c).

237.    In such a case, the manufacturer is under a duty to issue warnings or instructions in the manner of a reasonably prudent manufacturer in the same or similar circumstances. This duty is satisfied if the manufacturer exercises reasonable care to inform product users. Id.

238.    At all times relevant, Manufacturing Defendants were in the business of, among other things, manufacturing and/or selling and distributing AFFF and other PFAS-containing products.

COMPLAINT AND JURY DEMAND - 45

239.    As a manufacturer and/or seller and distributor of a commercial product, Manufacturing Defendants had a duty to provide adequate, full instructions, and warnings about the risks of injury posed by their products.

240.    Considering the factors related to risk, foreseeability, social utility, the burden of guarding against the harm, and the practical consequences of placing that burden on Manufacturing Defendants, Manufacturing Defendants owed a cognizable duty to Hannah Heights not to contaminate Hannah Heights Property with AFFF containing dangerous levels of PFAS.

241.    The storage, use, handling, and release of AFFF during training events and other activities at the Fire House on Hannah Heights Property was foreseeable. Manufacturing Defendants knew or should have known there was a high likelihood that PFAS from AFFF and other PFAS-containing products would enter the soil and groundwater, persist there indefinitely, cause risks to human health and the environment, and harm Hannah Heights Property.

242.    At the time of the design, manufacture and/or distribution and sale of the AFFF and other PFAS-containing products, Manufacturing Defendants knew or should have known of the dangerous properties of its AFFF and other PFAS-containing products.

243.    On information and belief, Manufacturing Defendants at significant times failed to provide sufficient instructions and warnings to the users of AFFF and other PFAS-containing products, including the firefighters using AFFF and other PFAS-containing products for training purposes at the Fire House. As a result, users were unaware that use and release of Manufacturing Defendants' AFFF and other PFAS-containing products to the environment

COMPLAINT AND JURY DEMAND - 46

would contaminate groundwater, including drinking water supplies, and cause risks to those exposed to the water supplies.

244.    On information and belief, Manufacturing Defendants failed to provide adequate instructions and warnings to users that AFFF and other PFAS-containing products contamination of the groundwater and soil would pose dangers to human health and the environment at significant times.

245.    Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the use and release of AFFF and other PFAS-containing products.

246.    Manufacturing Defendants' failure to provide adequate instructions and warnings constitutes a pattern of continuous and ongoing tortious conduct.

247.    Had Manufacturing Defendants provided adequate warnings, users of AFFF and other PFAS-containing products would have taken measures to store, use, discharge, and dispose of AFFF and other PFAS-containing products in such a manner as to reduce or eliminate contamination of groundwater and soil.

248.    Manufacturing Defendants' failure to warn against the likelihood of contamination from their AFFF and other PFAS-containing products caused its chemical components, including PFAS, to contaminate Hannah Heights Property.

249.    Manufacturing Defendants' failure to warn of the environmental and health impacts caused by releasing their AFFF and other PFAS-containing products and the chemical components of their AFFF and other PFAS-containing products directly and proximately caused

COMPLAINT AND JURY DEMAND - 47

PFAS to contaminate Hannah Heights Property, causing Hannah Heights to lose the use and benefit of its property and to incur costs to respond to the contamination.

250.     Manufacturing Defendants' failure to provide adequate warnings or instructions renders Manufacturing Defendants' AFFF and other PFAS-containing products defective.

251.     Manufacturing Defendants' conduct, and the resulting contamination of groundwater by Manufacturing Defendants' AFFF and other PFAS-containing products, has caused and will continue to cause Hannah Heights to incur significant costs.

252.     Hannah Heights' costs include but are not limited to those to: assure water quality in compliance with mandatory federal MCLs; sample and analyze water and other media for PFAS; respond to public inquiries and manage public relations regarding the contamination; assess future costs of water treatment that include installing, operating, and maintaining filtration systems; conduct a pilot study for a new treatment system; increase the frequency of water quality testing and monitoring; construct a new water system and related distribution system; manage and dispose of other media; and additional response costs necessary for Hannah Heights to address the PFAS contamination affecting its property and rights.

## X.     FIFTH CLAIM FOR RELIEF – DEFECTIVE PRODUCT – DESIGN DEFECT (MANUFACTURING DEFENDANTS)

253.     Hannah Heights hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

254.     This cause of action is brought pursuant to Washington State statutory law, including but not limited to Chapter 7.72 RCW.

255.     Under Washington law, "a product manufacturer is subject to liability…if the claimant's harm was proximately caused by the negligence of the manufacturer in that the

COMPLAINT AND JURY DEMAND - 48

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided." RCW 7.72.030(1).

256.    "A product is not reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms, and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product." RCW 7.72.030(1)(a).

257.    At all times relevant, Manufacturing Defendants were in the business of, among other things, manufacturing, selling, and/or distributing AFFF and other PFAS-containing products.

258.    It was foreseeable that toxic chemicals from the AFFF and other PFAS-containing products that Manufacturing Defendants manufactured and/or sold and distributed would enter the water supplies of Hannah Heights and cause damage to its property interests.

259.    Alternative designs and formulations of AFFF and other PFAS-containing products were available, technologically feasible and practical, and would have reduced or prevented the reasonably foreseeable risks of harm to Hannah Heights.

260.    Further, design, formulation, manufacture, and/or distribution and sale of a product containing chemicals that were so toxic, mobile, and persistent in the environment was unreasonably dangerous.

261.    The AFFF and other PFAS-containing products manufactured and/or distributed and sold by Manufacturing Defendants were defective in design because the foreseeable risk of harm posed by the AFFF and other PFAS-containing products could have been reduced or

COMPLAINT AND JURY DEMAND - 49

eliminated by the adoption of a reasonable alternative design, and because it was unreasonably dangerous.

262.    Manufacturing Defendants' products were defective at the time of manufacture and/or distribution and sale, and thus at the time they left Manufacturing Defendants' control.

263.    Manufacturing Defendants' sale and distribution of AFFF and other PFAS-containing products constitutes a pattern of continuous and ongoing tortious conduct.

264.    On information and belief, Manufacturing Defendants have sold and distributed AFFF and other PFAS-containing products in a tortious manner.

265.    Manufacturing Defendants have not recalled their AFFF and other PFAS-containing products.

266.    Manufacturing Defendants' manufacture and/or distribution and sale of a defectively designed product caused PFAS to contaminate Hannah Heights Property and to damage Hannah Heights.

267.    Manufacturing Defendants' design, formulation, manufacture and/or distribution and sale of a defective product renders Manufacturing Defendants strictly liable in damages to Hannah Heights.

268.    Manufacturing Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights of Hannah Heights.

269.    Manufacturing Defendants' conduct, and the resulting contamination of groundwater by the chemical components of Manufacturing Defendants' AFFF and other PFAS-containing products, caused Hannah Heights to incur significant costs.

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA 98101
Phone (206) 292-2600
Fax (206) 292-2601

270.     Hannah Heights' costs include but are not limited to those to: assure water quality in compliance with mandatory federal MCLs; sample and analyze water and other media for PFAS; respond to public inquiries and manage public relations regarding the contamination; assess future costs of water treatment that include installing, operating, and maintaining filtration systems; conduct a pilot study for a new treatment system; increase the frequency of water quality testing and monitoring; construct a new water system and related distribution system; manage and dispose of other media; and additional response costs necessary for Hannah Heights to address the PFAS contamination affecting its property and rights.

## XI.     SIXTH CLAIM FOR RELIEF – NUISANCE (MANUFACTURING DEFENDANTS AND DEFENDANT FIRE DISTRICT)

271.     Hannah Heights hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

272.     In Washington, a "nuisance is an unreasonable interference with another's use and enjoyment of property[.]" Kitsap County v. Allstate Ins. Co., 964 P.2d 1173, 1185 (Wash. 1998); see also RCW 7.48.120 ("Nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or render dangerous for passage, any lake or navigable river, bay, stream, canal or basin, or any public park, square, street or highway; or in any way renders other persons insecure in life, or in the use of property.").

273.     If an activity is conducted unlawfully and it interferes with someone's use and enjoyment of their property, it is a nuisance per se. If the activity is conducted lawfully, it only

**Marten Law LLP**
1191 Second Avenue, Suite 2200
Seattle, WA 98101
Phone (206) 292-2600
Fax (206) 292-2601

becomes a nuisance if it unreasonably interferes with a person's use or enjoyment of property. Tiegs v. Watts, 954 P.2d 877, 879 (Wash. 1998).

274.    To be unreasonable, and thus actionable, the interference must be unreasonable and substantial. City of Moses Lake v. United States, 430 F. Supp. 2d. 1164, 1184 (E.D. Wash. 2006). The reasonableness of an interference is determined by weighing the harm to the aggrieved party against the social utility of the activity. Kitsap Cty. V. Kitsap Rifle & Revolver Club, 337 P.3d 328, 339 (Wash. App. 2014). The interference also may be unintentional and negligent or reckless. Hostetler v. Ward, 704 P.2d 1193, 1202 (Wash. App. 1985). Conduct constituting a nuisance can include indirect or physical conditions created by the defendant that cause harm. Bradley, 709 P.2d at 787. Nuisance may be a permanent or continuing tort. For continuing nuisance, the claim continues to accrue as long as tortious conduct continues. Wallace v. Lewis County, 137 P.3d 101, 111 (Wash. App. 2006).

275.    Defendants directly and proximately caused, and continue to cause, PFAS contamination of Hannah Heights' property and water rights. Defendants unreasonably and substantially invaded Hannah Heights' interests in the use and enjoyment of its property and water rights.

276.    Defendants' actions have contaminated Hannah Heights' water supplies with PFAS. Due to the contamination, Hannah Heights can no longer supply its residents with drinking water.

277.    The unreasonable and substantial interference with the use and enjoyment of Hannah Heights' property interests includes, but is not limited to: the contamination of groundwater and soil on Hannah Heights' property, including the source of the Hannah Heights'

COMPLAINT AND JURY DEMAND - 52

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

appropriated water rights; the need to shut down contaminated wells and seek alternative sources of drinking water; and the exposure to known toxic chemicals manufactured and/or sold and distributed by Manufacturing Defendants.

278.     Defendants' interference is intentional, substantial, and unreasonable.

279.     The Fire District intentionally and unreasonably discharged AFFF by spraying and dumping it directly onto open ground, soil, and water at the Fire House during firefighting training activities. The Fire District also intentionally and unreasonably failed to contain and handle PFAS effluent and contaminated soil as hazardous waste.

280.     The Fire District's intentional discharges were made knowing that they would contaminate groundwater and result in PFAS migrating to Hannah Heights' properties and water rights.

281.     Given the chemical properties of PFAS in AFFF and other PFAS-containing products, Manufacturing Defendants knew and/or should have reasonably foreseen that the use of AFFF and other PFAS-containing products as intended would result in an invasion of Hannah Heights' property interests, including obstruction of its property. Such an invasion of its property rights amounts to a special injury to Hannah Heights.

282.     Manufacturing Defendants' sale and distribution of AFFF and other PFAS-containing products constitutes a pattern of continuous and ongoing tortious conduct.

283.     Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights of property of Hannah Heights.

COMPLAINT AND JURY DEMAND - 53

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA 98101
Phone (206) 292-2600
Fax (206) 292-2601

284.    Defendants' conduct, and the resulting contamination of water sources by the chemical components of Manufacturing Defendants' AFFF and other PFAS-containing products, has caused or will require Hannah Heights to incur significant costs.

285.    Hannah Heights' costs include, but are not limited to, those to: assure water quality in compliance with mandatory federal MCLs; sample and analyze water and other media for PFAS; respond to public inquiries and manage public relations regarding the contamination; assess future costs of water treatment that include installing, operating, and maintaining filtration systems; conduct a pilot study for a new treatment system; increase the frequency of water quality testing and monitoring; construct a new water system and related distribution system; manage and dispose of other media; and develop additional response costs necessary for Hannah Heights to address the PFAS contamination affecting its property and rights.

## XII.    SEVENTH CLAIM FOR RELIEF – TRESPASS (DEFENDANT FIRE DISTRICT)

286.    Hannah Heights incorporates all averments in this Complaint as if restated fully herein.

287.    The Fire District has trespassed, and continues to trespass, on Hannah Heights' property, including its water rights, by contaminating Hannah Heights' property with PFAS. In Washington, "[a] trespass is an intrusion onto the property of another that interferes with the other's right to exclusive possession." Phillips v. King Cty., 968 P.2d 871, 876 n.4 (Wash. 1998). The intrusion occurs when the actor causes something else to enter property, including land and water. See Arment v. Bickford, 247 P. 952 (Wash. 1926) (holding water right a sufficient property interest for trespass).

COMPLAINT AND JURY DEMAND - 54

288.    "One is subject to liability to another for trespass . . . if he intentionally [or negligently]: (a) enters land in the possession of the other, or causes a thing or a third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which he is under a duty to remove." Bradley v. Am. Smelting & Ref. Co., 709 P.2d 782, 785 (Wash. 1985).

289.    Trespass is a strict liability tort. It is not necessary that a trespasser knows that it, or some instrumentality under its control, invades another's land.  If the trespasser knows that the consequences are certain, or substantially certain, to result from his act, then he is treated as though the trespass was intentional. The trespass may be caused indirectly, including by the wrongful discharge of contaminants. Id.

290.    Trespass may be a permanent or continuing tort. For continuing trespass, the claim continues to accrue as long as tortious conduct continues. Woldson v. Woodhead, 149 P.3d 361, 363–64 (Wash. 2006).

291.    The Fire District intentionally sprayed, dumped, discharged, and disposed of AFFF onto open ground, soil, and water at the Fire House during firefighting training activities.

292.    PFAS migrated from the Fire House through groundwater into Hannah Heights' drinking water system and surrounding property, including Well 2, which has provided roughly 70-80% of the community's drinking water.

293.    The existence of PFAS beneath, and continued migration onto, Hannah Heights' property and water rights constitutes a continuing trespass.

294.    The Fire District holds no right to possess Hannah Heights' property and water rights.

COMPLAINT AND JURY DEMAND - 55

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

295.     The Fire District did not have Hannah Heights' permission to place PFAS on, in, or beneath Hannah Heights' property, including Hannah Heights' wells.

296.     On information and belief, the Fire District knows and knew, or should have known, that PFAS migrated or would migrate into the groundwater, and into Hannah Heights' real property and water supply.

297.     The Fire District intentionally and unreasonably failed to remediate or stop the PFAS contamination from spreading to Hannah Heights' property and water supplies.

298.     The intrusion of PFAS into Hannah Heights' property and water rights has caused and will cause Hannah Heights to suffer damages, including the costs to: assure water quality in compliance with mandatory federal MCLs; sample and analyze water and other media for PFAS; respond to public inquiries and manage public relations regarding the contamination; assess future costs of water treatment that include installing, operating, and maintaining filtration systems; conduct a pilot study for a new treatment system; increase the frequency of water quality testing and monitoring; construct a new water system and related distribution system; manage and dispose of other media; and develop additional response costs necessary for Hannah Heights to address the PFAS contamination affecting its property and rights.

299.     The Fire District's trespass has directly and proximately caused damage and destruction to Hannah Heights' water rights and property, causing economic loss.

## XIII.    EIGHTH CLAIM FOR RELIEF – UNJUST ENRICHMENT (MANUFACTURING DEFENDANTS)

300.     Hannah Heights hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

COMPLAINT AND JURY DEMAND - 56

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

301.    Manufacturing Defendants profited from the manufacture and/or distribution and sale of AFFF and other PFAS-containing products and continued to do so long after it was aware of the health and environmental risks of its products. Further, on information and belief, Manufacturing Defendants failed to recall their products to prevent the further release of their AFFF and other PFAS-containing products into groundwater and onto Hannah Heights Property, long after they became aware of the toxic qualities of PFAS. Instead, they continued to hold their products out as safe. Through fraudulent actions and inactions, Manufacturing Defendants have been unjustly enriched at the expense of Hannah Heights.

302.    Manufacturing Defendants' enrichment is both unjust under the circumstances and as between these parties. Puget Sound Security Patrol, Inc. v. Bates, 396 P.3d 709, 717 (Wash. App. 2017). Hannah Heights has sustained millions of dollars in damages as a direct result of Manufacturing Defendants' failure to recall their products. Manufacturing Defendants profited from those sales. Hannah Heights' resulting damages include but are not limited to: loss of use and enjoyment of its property rights, loss of value of its property and rights, the cost of shutting down contaminated wells, and the cost of monitoring and potentially treating groundwater contaminated with PFAS, including increased water quality testing and monitoring. These damages necessitate an equitable remedy.

303.    Hannah Heights asks the Court to award the expenditures saved and the profits obtained by Manufacturing Defendants at the expense of Hannah Heights as a remedy.

### XIV.   NINTH CLAIM FOR RELIEF – DECLARATORY JUDGMENT (MANUFACTURING DEFENDANTS AND DEFENDANT FIRE DISTRICT)

304.    Hannah Heights hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

COMPLAINT AND JURY DEMAND - 57

305.    The Court has jurisdiction to award declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*

306.    An actual, present, and existing dispute exists between Hannah Heights, Manufacturing Defendants, and the Fire District. The parties have genuine and opposing interests, which are direct and substantial, relating to Manufacturing Defendants' and the Fire District's liability and responsibility for Hannah Heights' damages incurred, and the future costs that Hannah Heights will incur to abate the continuing PFAS migration and contamination from the Fire House where AFFF was released.

307.    The possibility of Hannah Heights incurring future costs necessary to abate the continuing PFAS migration and contamination from the Fire House where AFFF was released is not unlikely, remote, or speculative.

308.    Because its response action is ongoing, Hannah Heights will continue to incur response costs attributable to PFAS contamination caused by Manufacturing Defendants and the Fire District. Hannah Heights is entitled to declaratory judgement under CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), on the liability of Manufacturing Defendants and the Fire District for response costs that will be binding on any subsequent actions to recover further response costs.

309.    Hannah Heights is entitled to entry of a judgment declaring that Manufacturing Defendants and the Fire District are liable for damages and future costs necessary to abate the continuing PFAS migration and contamination from the Fire House, where AFFF was released, under Washington common law and federal statutory law. Such judgment shall be final, conclusive, and binding on any subsequent action or actions to recover further response costs or damages.

**MARTEN LAW LLP**
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

310. Upon entering the declaratory judgment prayed for herein, the Court should retain jurisdiction to grant Hannah Heights further relief as necessary and proper to effectuate the Court's declaration, pursuant to 28 U.S.C. § 2202.

## XV.    TENTH CLAIM FOR RELIEF – WASHINGTON CONSUMER PROTECTION ACT (MANUFACTURING DEFENDANTS)

311. Hannah Heights hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

312. Manufacturing Defendants' manufacturing, marketing, promoting, distributing, and sale of AFFF and other PFAS-containing products constitute "trade" or "commerce" within the meaning of the CPA, RCW 19.86.010(2).

313. Manufacturing Defendants engaged in unfair and/or deceptive acts or practices within the meaning of RCW 19.86.020 by, inter alia, representing that their AFFF and other PFAS-containing products were safe while misrepresenting and omitting risks and complications associated with their AFFF and other PFAS-containing products.

314. Manufacturing Defendants also engaged in unfair and/or deceptive acts or practices within the meaning of RCW 19.86.020 by, inter alia, omitting and/or failing to update their information and marketing materials with known, material risks associated with the use of AFFF and other PFAS-containing products.

315. Manufacturing Defendants' misrepresentations were deceptive because they have the capacity to mislead a substantial number of consumers.

316. These acts or practices occurred in trade or commerce because they occurred in connection with the sale of AFFF and other PFAS-containing products to the Fire District and such sale directly and indirectly affected the people of Hannah Heights.

MARTEN LAW LLP
1191 Second Avenue, Suite 2200
Seattle, WA 98101
Phone (206) 292-2600
Fax (206) 292-2601

317.     An act or practice may be unfair if it offends public policy; is immoral, unethical, oppressive, unconscionable; or causes injury to consumers. Manufacturing Defendants' acts or practices as alleged in this Complaint are unfair.

318.     Manufacturing Defendants' acts and practices injured Hannah Heights and its property by foreseeably causing Hannah Heights' drinking water supply to be contaminated by AFFF and other PFAS-containing products and forcing Hannah Heights to incur substantial response costs.

## XVI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against 3M, Tyco, BASF, and the Fire District, and grant Hannah Heights the following relief:

a) An award to Hannah Heights of all damages and/or response costs suffered, or that will be suffered, as a result of Manufacturing Defendants' and the Fire District's actions, including, without limitation: costs to take PFAS-contaminated wells offline; costs to manage water quality; costs to collect and analyze samples of groundwater, soil, and other media; costs to investigate and remediate contaminated soil and groundwater; costs to manage public relations and public inquiries relating to PFAS contamination of Hannah Heights' drinking water; the decrease in the value and marketability of Hannah Heights' property and property rights; the loss of use and enjoyment of the property and property rights; the identification and procurement of alternative water sources as needed; remediation of soil contaminated with PFAS in Hannah Heights to prohibit its further migration to groundwater; and the annoyance, discomfort, and inconvenience caused to Hannah Heights by Defendants' PFAS releases to the environment—in an amount to be proven at trial;

COMPLAINT AND JURY DEMAND - 60

b) An award to Hannah Heights, in an amount to be determined at trial, commensurate to the amount of an order for disgorgement of the profits and savings which were obtained by the unjust enrichment of Manufacturing Defendants through their manufacture and/or distribution and sale of AFFF;

c) A declaration that 3M, Tyco, BASF, and the Fire District are liable for damages suffered by Hannah Heights to date, and for costs to be incurred by Hannah Heights in the future to abate the continuing PFAS migration and contamination from the Fire House;

d) An order awarding to Hannah Heights its attorneys' fees and costs, as provided by law;

e) An order imposing a constructive trust over any such proceeds for the benefit of the Plaintiff;

f) An award of treble damages, as provided by law;

g) An award to Hannah Heights of pre- and post-judgment interest, as provided by law; and

h) An order and award to Hannah Heights for all such other and further relief, including equitable and declaratory, as the Court deems just and proper.

## XVII.  DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) Hannah Heights demands a trial by jury on all claims so triable.

Respectfully submitted on April 10, 2025.

COMPLAINT AND JURY DEMAND - 61

MARTEN LAW LLP
1191 Second Avenue, Suite 2200
Seattle, WA  98101
Phone (206) 292-2600
Fax (206) 292-2601

**MARTEN LAW, LLP**

By:  *s/ Jeff B. Kray*
    Jeff B. Kray, Bar No. 22174
    1191 Second Ave, Suite 2200
    Seattle, WA 98101
    Telephone:(206) 292 2608
    Fax: (206) 292 2601
    jkray@martenlaw.com

    *s/ Emma L. Lautanen*
    Emma L. Lautanen, Bar No. 61541
    1191 Second Ave, Suite 2200
    Seattle, WA 98101
    Telephone:(206) 292 2608
    Fax: (206) 292 2601
    elautanen@martenlaw.com

    *Attorneys for Hannah Heights Owners Association*

COMPLAINT AND JURY DEMAND - 62